

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00020-CV
_____

IN THE INTEREST OF A.B. AND D.B., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2020-1859-DR

Before Morriss, C.J., Stevens and Carter,* JJ.
Memorandum Opinion by Justice Stevens

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

The Department of Family and Protective Services filed a petition to terminate Mother's parental rights to her children, Amanda and Darren.[1]  Following a bench trial, the trial court terminated Mother's parental rights after finding that (1) she knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, (3) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the children's return, as described in Section 161.001(b)(1)(O) of the Texas Family Code, (4) she used a controlled substance in a manner that endangered the health or safety of the children, as described in Section 161.001(b)(1)(P), and (5) termination of her parental rights was in the children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P), (b)(2).

On appeal, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings that there were statutory grounds to terminate her parental rights and that doing so was in the children's best interests.[2]  We conclude that the evidence presented at

---

[1]We use pseudonyms to protect the identity of the children.  *See* TEX. R. APP. P. 9.8.

[2]Father has also filed a brief with this Court challenging the termination of his parental rights, but we lack jurisdiction to address the merits of Father's appeal.  Father's first notice of appeal, which was filed before Mother's notice of appeal to our Court, specified that his appeal was taken to the Twelfth Court of Appeals.  As a result, the Twelfth Court of Appeals acquired jurisdiction over Father's appeal.  The Texas Supreme Court has written:

> The general common law rule in Texas is that "the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts."  *Curtis v. Gibbs*, 511 S.W.2d 263, 267 (Tex. 1974); *Bailey v. Cherokee Cnty. Appraisal Dist.*, 862 S.W.2d 581, 586 (Tex. 1993); *Mower v. Boyer*, 811 S.W.2d 560, 563 n.2 (Tex. 1991).  This rule is grounded on the principles of

> comity, convenience, and the need for an orderly procedure in resolving jurisdictional disputes. *See Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 248 (Tex. 1988).
>
> Although the rule of dominant jurisdiction has most often been applied at the trial court level, the rationale underlying the rule also applies to appeals in those instances where the Legislature has not otherwise provided an allocation mechanism. Once the first appeal is perfected, the court of appeals acquires jurisdiction . . . . *See Ammex Warehouse Co. v. Archer*, 381 S.W.2d 478, 482 (Tex. 1964).

*Miles v. Ford Motor Co.*, 914 S.W.2d 135, 138 (Tex. 1995) (per curiam).

After the Twelfth Court of Appeals acquired jurisdiction over Father's appeal, Father filed an amended notice of appeal, which merely replaced the Twelfth Court with our Court as the designated appellate court and listed the cause number assigned to Mother's appeal in this case. Rule 25.1(g) of the Texas Rules of Appellate Procedure states that an amended notice of appeal may only be filed to correct "a defect or omission in an earlier filed notice." TEX. R. APP. P. 25.1(g). Father's first-filed notice contained no defect or omission and vested the Twelfth Court of Appeals with jurisdiction over Father's appeal. As a result, at the time the amended notice was filed with us, the case was still pending before the Twelfth Court.

Once an appellate court has acquired jurisdiction, an "[a]ppellant cannot invoke the jurisdiction of [another] Court by amending [his] notice of appeal." *In re M.A.H.*, No. 12-06-00328-CV, 2006 WL 2960878, at *1 (Tex. App.—Tyler Oct. 18, 2006, no pet.) (per curiam) (mem. op.); *see Caler v. State*, No. 12-08-00266-CR, 2009 WL 1314176, at *1 (Tex. App.—Tyler May 13, 2009, no pet.) (mem. op., not designated for publication but cited as an aid in developing our reasoning pursuant to *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) ("Appellant cannot also invoke the jurisdiction of [a different appellate] court by filing a later notice of appeal directed to [another appellate] court."); *Capehart v. State*, 257 S.W.3d 814, 815–16 (Tex. App.—Texarkana 2008, no pet.). This is because "a court of appeals 'will not be permitted to interfere with the previously attached jurisdiction of another court of co-ordinate power.'" *Miles*, 914 S.W.2d at 138 (quoting *Morrow v. Corbin*, 62 S.W.2d 641, 645 (Tex. 1933)).

"Only the Supreme Court is authorized to transfer appellate cases" if "there is good cause for the transfer." *Id.* at 137 (quoting TEX. GOV'T CODE ANN. § 73.001). Father should have used the following procedure described in *Miles*, but did not:

> The proper procedure for presenting a motion to transfer to th[e] [Supreme] Court is as follows: The party requesting a transfer should file a copy of the motion to transfer in each of the two courts of appeals, asking that, when the motion is forwarded to the Supreme Court, each court of appeals advise the Supreme Court in writing whether it has any objection to the proposed transfer. Any briefs in favor of the proposed transfer should also be filed in each court of appeals and forwarded with the transfer motion. We will then have the motion, the briefs, and the comments of the two courts of appeals in determining whether to grant the motion to transfer.

*Id.* at 137 n.2.

Because Father failed to file a motion to transfer, on March 23, 2022, the Twelfth Court of Appeals set Father's case for submission but, on Father's motion, it disposed of Father's appeal by dismissing it. The dismissal "ha[d] the effect of affirming the judgment of the lower court without considering any assignments of error thereto." *Tex. Foundries v. Int'l Moulders & Foundry Workers' Union*, 248 S.W.2d 460, 461 (Tex. 1952); *see Robertson v. Land*, 519 S.W.2d 227, 229 (Tex. App.—Tyler 1975, no writ) ("By dismissing the appeal only and not dismissing the case, the judgment of the trial court is left undisturbed and thereby, in effect, is affirmed without, according to the appellants, a hearing upon the merits of their appeal."). "Since a dismissal of appellants' appeal, in effect, affirms the judgment appealed from," the Tyler court has fully disposed of Father's appeal. *Robertson*, 519 S.W.2d at 229. The Tyler court's mandate issued on June 13, 2022.

"Appellate jurisdiction cannot be created by consent, stipulation of the parties, or waiver, either by the court or by litigants." *Birmingham Fire Ins. Co. of Pennsylvania v. Am. Nat'l Fire Ins. Co.*, 928 S.W.2d 226, 228 (Tex. App.—Texarkana 1996, no writ). "Jurisdiction is fundamental and cannot be ignored by this court or waived

trial supported the trial court's findings. As a result, we affirm the trial court's judgment terminating mother's parental rights to Amanda and Darren.

## I. A Statutory Ground for Termination of Mother's Parental Rights is Supported by Legally and Factually Sufficient Evidence

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that

by the parties." *Id.* "When jurisdiction does not lie in an appellate court, it normally has only the power to recognize that fact and dismiss the appeal for want of jurisdiction, regardless of any agreement or waiver by the parties." *Id.* We conclude that Father's amended notice of appeal did not vest this Court with jurisdiction because his appeal was pending in the Tyler court when it was filed. Because Father never filed a motion to transfer with the Texas Supreme Court, and because the Tyler Court of Appeals has disposed of Father's appeal by dismissing it, we are without jurisdiction over Father's appeal. As a result, Father's appeal is dismissed for want of jurisdiction.

4

termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d

5

17, 25 (Tex. 2002))); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

## B.     Sufficient Evidence Supports the Ground E Finding

In her first issue, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings under Grounds D, E, O, and P. "Only one predicate finding

under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.))). Even so, when the trial court's findings under Grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least one of those grounds. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under [S]ection 161.001(b)(1)(D) or (E) of the Family Code."). This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children. *Id.* at 234; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (providing as a ground for termination of parental rights that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").

Ground E permits the termination of a parent's parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d at 803. "'Endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—

7

Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child[ren] or that the child[ren] actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. Under Ground "(E), it is sufficient that the child[ren]'s well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under [Ground] (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67.

Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *see In re N.S.G.*, 235 S.W.3d at 366–67. "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* at 902; *see In re N.S.G.*, 235 S.W.3d at 367. The endangering conduct may also occur "either before or after the child[ren]'s removal by the Department." *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

"'Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under' Ground E." *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem.

8

op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker*, 312 S.W.3d at 617)). "Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *Id.* (quoting *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *In re N.S.G.*, 235 S.W.3d at 368)); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). In our analysis under Ground E, we may also consider a parent's failure to complete relevant requirements of a family service plan. *In re Z.J.*, 2019 WL 6205252, at *11; *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.).

The evidence at trial established a continued pattern of domestic violence and drug use. Kimberly Degrasse, an investigator with the Department, testified that the Department received an intake alleging that Mother and Father engaged in domestic violence, that Father had punched out a window causing shards of glass to land on a bed near Darren, and that Darren was left on the bed with the glass because Mother was not paying attention to him. The intake further alleged that Mother was under the influence of a substance and that there was a strong smell of marihuana emanating from Mother's apartment.

At trial, Mother admitted that Amanda and Darren had witnessed incidents of domestic violence. According to Degrasse, Mother also admitted that Father had punched out the window

when he was questioned about the intake. The children's grandmother testified that Mother and Father were constantly arguing and bickering. Their great-grandmother testified that Mother and Father would "scream and holler and call each other names and say degrading things to each other," and she believed that Mother and Father should not be left alone with the children until their behavior improved. Degrasse said that there had been additional incidents of domestic violence since the initial intake and added that Mother had shown her "numerous bruises, including bruises on her shoulder, arm, wrist, and hands." Even so, Mother testified that she intended to continue living with Father and wanted to remain married to him.

Mother also admitted that she was a drug addict. The Department's petition in this case was filed in October 2020 after Darren tested positive for methamphetamine. Dawn Hahn, a laboratory director at Quest Diagnostics, testified that Mother and Father both had tested positive for amphetamine, methamphetamine, and marihuana metabolite in November 2020 and February 2021. According to Hahn, Mother also tested positive for the same drugs in March, and Father tested positive for amphetamine and methamphetamine in July.

According to Shandra Newill, the Department's conservatorship caseworker, Mother and Father "tested positive after receiving extensive services." At the December 29, 2021, trial, Mother admitted that she relapsed after going to rehabilitation and that she used drugs in September. Newill testified that Mother failed to complete a drug test on October 21, 2021, and both Mother and Father failed to complete drug tests requested on November 23, December 1, and December 9, 2021. Newill testified that Father was arrested in November and again in December and that both Father and Mother, who were still married, were living together in

10

Father's parents' home. In the middle of Mother's testimony, the trial court continued the trial until February 21, 2022. Newill requested that Mother and Father take a drug test on December 30, 2021, but testified that they failed to complete it. By that time, the record showed, Mother was facing a pending drug charge.

At the continued February 2022 trial, Mother admitted that she had been arrested for fraudulent use or possession of identifying information. Mother also admitted that there had been a fresh incident of domestic violence but stated that she had called the police and obtained a no-contact order against Father, who was still incarcerated. Mother testified that she was injured during the incident, had bled profusely, and was afraid of Father. Even so, Mother was still living with Father's parents and wearing her wedding ring, and she did not definitively answer whether she would divorce Father but instead said, "[T]he answer that I'm going to give for that is that at this point, this day in time, given for my kids, I'm going to have to let him go."

While Mother had made progress on many aspects of her family service plan, Newill testified that Mother had not yet successfully completed the court-ordered drug treatment program. Tina Huseth, a licensed chemical dependency counselor, testified that Mother was also unable to complete "individual counseling due to the fact of the ongoing substance use and exposure to domestic violence" and was unsuccessfully discharged from Huseth's services. Huseth said that Mother had reported that Father had taken all her money and clothes, that she had no food, and that she was afraid that Father would kill her. Huseth was also concerned that Mother and Father associated with unsavory individuals that presented a concern for the safety of the children. According to Huseth, Mother was unable to demonstrate that she could protect

11

herself or the children, and Mother said that Father had even "showed up with a gun at one point."

Mother admitted at trial that she was unemployed, and Newill testified that neither parent could provide for the children financially or maintain stable housing. Because of their ongoing, unaddressed problems, witnesses from the Department and Tara Peck, the Court Appointed Special Advocate (CASA) supervisor, testified that termination of Mother's and Father's parental rights was in the children's best interests.

"A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under [Ground] (E) even if there is no direct evidence that the parent's drug use actually injured the child." *In re H.M.J.*, 2018 WL 3028980, at \*5 (quoting *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at \*4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (per curiam) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). From the above-recited evidence, we conclude that the record firmly established that Mother's continued drug use and returned exposure to Father despite his drug use and domestic violence, which the children had witnessed in the past, constituted a course of conduct that endangered the children's physical and emotional well-being. As a result, we find that legally and factually sufficient evidence supported the trial court's finding under Ground E.

Since there was sufficient evidence supporting the trial court's finding under Ground E, we need not review its findings under Grounds D, O, and P. *See J.T. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00070-CV, 2021 WL 2672055, at \*9 (Tex. App.—Austin June 30,

12

2021, no pet.) (mem. op.); *In re M.F.*, No. 14-19-00964-CV, 2020 WL 2832166, at \*8 (Tex. App.—Houston [14th Dist.] May 28, 2020, pet. denied) (mem. op.). We overrule Mother's first point of error.

## II.  Sufficient Evidence Supports the Trial Court's Best-Interest Finding

Next, Mother argues that legally and factually sufficient evidence fails to support the trial court's finding that termination of her parental rights was in Amanda and Darren's best interests. Because we disagree with Mother, we overrule her last point of error.

### A.  Standard of Review

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

> In determining the best interests of the child, courts consider the following *Holley* factors:
>
> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b).

13

The Department is not required to present proof of each *Holley* factor. *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27). "When considering the child[ren]'s best interest[s], we may take into account that a parent is unable to provide adequate care for [her] child[ren], lacks parenting skills, or exercises poor judgment." *Id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child[ren]'s best interest[s]." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). The parent's "past performance as a parent [is] relevant in determining the child[ren]'s best interest[s]." *Id.* (citing *In re C.H.*, 89 S.W.3d at 28). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

### B.    Analysis of the *Holley* Factors

As for the first *Holley* factor, Amanda was four years old and Darren was three years old at trial, and there was no evidence of their express desires. Even so, Newill testified that Mother regularly visited with the children, who seemed happy to see her. Mother testified that she and the children loved each other, and the children's grandmother testified that Amanda and Darren had a strong bond with Mother, who was attentive and loving. Given this evidence, "[w]e find that the first *Holley* factor weighs against termination" of Mother's parental rights. *See In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (citing *In re E.N.C.*, 384 S.W.3d at 808).

14

As for the second *Holley* factor, Mother admitted that Amanda and Darren had witnessed domestic violence between Mother and Father, and Newill testified that the children "do exhibit behaviors of children that have been exposed to domestic violence." Both Newill and Megan Bourgeois, the CASAs, testified that the children were suffering from "emotional problems" and required counseling. Kara Jenkins, the children's foster mother, discussed the children's counseling and said that they exhibited anger, sensitivity, and irritability after visits with Mother. This testimony established that the needs of Mother's young children were great. Yet, given Mother's drug use, unemployment, and testimony that she planned to either live with Father's parents, where she could potentially be exposed to further domestic violence, or in a women's center, sufficient evidence supported the finding that Mother was unable to provide for Amanda's and Darren's physical or emotional needs. *See In re Z.M.*, 456 S.W.3d at 689 ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs.") (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at \*17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)).[3] We find that the second *Holley* factor weighs in favor of termination of Mother's parental rights.

As to the third, fourth, and fifth *Holley* factors, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.* (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at \*7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")).

---

[3]Bourgeois testified that neither Mother nor Father had a stable income or home.

While under her care, the children were exposed to domestic violence, and Darren tested positive for methamphetamine, either as a result of Mother's drug use or her failure to protect the child from exposure to Father's drug use. While the Department provided Mother with services and programs designed to assist Mother, the record showed that they had limited to no impact on Mother's behavior. Huseth testified that Mother and Father had completed anger management and surviving domestic violence counseling, but the record showed that Mother continued living with Father after the pendency of the case despite repeated acts of domestic violence. Degrasse testified that Mother "did not seem to understand the dangers and the risk that she was putting the children in." Although Mother and Father had completed parenting classes, Bourgeois was concerned with Mother's interactions with the children because Mother would "be doing tasks, like setting out food or . . . pulling something up on her phone instead of actually getting down and engaging with her kids." Most importantly, even after attending rehab, Mother relapsed and was facing a pending drug charge. Because she was unable to maintain sobriety and would be unable to protect herself from Father, Huseth, Newill, and Bourgeois all testified that Mother still presented a threat to the physical and emotional well-being of the children and would be unable to provide them with a safe environment. We find that the third, fourth, and fifth *Holley* factors weigh in favor of termination of Mother's parental rights.

As for the sixth and seventh *Holley* factors, Bourgeois testified that the children were placed with foster parents who provided a safe, stable, and loving environment for them. Jenkins, the children's foster mother, testified that Amanda and Darren had bonded with the foster family, discussed their daily routine, and said that they were attending a daycare with an

16

emphasis on early education.  Jenkins testified that they were "invested in the long term" and had discussed the possibility of adopting the children.  Mother either planned to remain in Father's parent's home or would go to a women's center.  Because Mother was exposed to Father's domestic violence in his parent's home, it was not considered to be a stable environment.  Although Mother said that she could obtain "six months of transitional housing," Mother's plan for the children after that was unclear.  We find that the sixth and seventh *Holley* factors weigh in favor of termination of Mother's parental rights.

As for the remaining eighth and ninth factors, Mother's acts and omissions discussed above, including her continued drug use, indicated that the existing parent-child relationship was not appropriate.  Although Mother initially claimed that she failed to drug test due to a lack of transportation, she later acknowledged that she could have taken the bus to the drug testing facility.  There was no excuse for Mother's positive drug tests during the pendency of the case.

Considering the *Holley* factors, and in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in Amanda's and Darren's best interests.  Therefore, we conclude that the evidence was sufficient to support the best-interest finding and overrule Mother's last point of error.

## III.    Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:    August 3, 2022
Date Decided:    August 19, 2022

17